

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-5-2002

# In Re: Beck

Precedential or Non-Precedential:

Docket 1-2522

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"In Re: Beck" (2002). *2002 Decisions*. Paper 104.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/104

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


NO. 01-2522


IN RE: JAMES JOSEPH BECK,

Debtor

GLORIA M. SATRIALE, ESQ.

v.

FIRST KEYSTONE MORTGAGE, INC.;
S. GREGORY SOUDER

GLORIA M. SATRIALE, ESQ.; OFFICE OF U.S. TRUSTEE;
FREDERIC J. BAKER, U.S. TRUSTEE,

Trustees

First Keystone Mortgage, Inc.
Appellant


On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 00-cv-04988 )
District Judge:  Honorable John P. Fullam


Argued January 23, 2002

BEFORE:  NYGAARD and STAPLETON, Circuit Judges,
                and CAPUTO, District Judge\*


                    (Filed February 5, 2002)


                        Sam L. Warshawer, Jr.   (Argued)
                        Lisa Lambert
                        Venzie, Phillips & Warshawer
                        2032 Chancellor Street
                        Philadelphia, PA  19103

                           Attorney for Appellee

                        Jay G. Ochroch   (Argued)
                        Prince Altee Thomas
                        Fox, Rothschild, O'Brien & Frankel
                        2000 Market Street, Tenth Floor
                        Philadelphia, PA  19103

                           Attorney for Appellant

                MEMORANDUM OPINION OF THE COURT



STAPLETON, Circuit Judge:

        This is an appeal from an order affirming a Bankruptcy Court's judgment in
favor of the appellee, Gloria M. Satriale, the trustee of James Joseph Beck's ("Beck" or

_____

\*  Honorable A. Richard Caputo, United States District Judge for the Middle District of
    Pennsylvania, sitting by designation.

the "debtor") bankruptcy estate.

The trustee commenced an adversary proceeding in the bankruptcy case seeking a judgment for monies owed under a settlement agreement entered in connection with previous litigation. Under that agreement dated November 23, 1992 and executed on November 30, 1992 (the "Settlement Agreement"), S. Gregory Souder agreed to pay Beck $150,000 up front and deliver to Beck a note evidencing an obligation to pay five annual payments of $85,000 in exchange for 49.33% of stock in First Keystone Mortgage, Inc. and certain promises and forbearances. First Keystone guaranteed Souder's payment on the note.

Under the terms of the Settlement Agreement, Beck resigned from the Board of Directors of First Keystone, returned all copies of certain business documents related to First Keystone, and agreed with certain exceptions that "prior to May 31, 1993, neither he nor any business, company, or entity with which he is affiliated [would] employ or engage in any business relationship with any person, business, company or entity who is an employee, agent, or affiliate of [First Keystone]."

Souder paid Beck $150,000 upon execution of the agreement. On January 2, 1994, Souder paid Beck the first $85,000 installment. On November 2, 1994, Souder and Beck entered into an agreement whereby Souder advanced Beck $15,000 to be credited to the annual payments due on the note. On January 1, 1995, Souder paid the second $85,000 installment on the note.

A little over two weeks later, on January 17, 1995, Beck filed for a voluntary petition for bankruptcy. The bankruptcy judge subsequently converted Beck's chapter 11 action to a case under chapter 7 and appointed Satriale as the trustee of Beck's estate.

The Bankruptcy Court found that immediately following the consummation of the Settlement Agreement, Beck operated his own mortgage brokerage business. However, in early 1995, after that business failed and after filing for bankruptcy, Beck again became affiliated with Souder and First Keystone. At first the affiliation was styled as a consulting relationship, but grew to a joint venture between First Keystone and a

business called Mortgage Network.  That relationship soured by June of 1997 and Beck again parted company with Souder and First Keystone.

On January 2, 1996, rather than directly paying Beck, Souder deposited $70,000 in an escrow account which represented the third installment on the note minus the $15,000 advance paid to Beck in 1994.  A year later, on January 9, 1997, Souder deposited the fourth $85,000 installment into the escrow account.

On December 2, 1997, Satriale demanded the past due balance on the note.  One week later, on advice of counsel, Souder withdrew the funds of the escrow account.  Souder did not make payment on the fifth installment.  The parties agree that the unpaid balance on the note is $240,000 (the three remaining $85,000 installments minus the $15,000 advance).

In the adversary proceeding, First Keystone contended that the settlement agreement was an executory contract at the time Beck filed for bankruptcy.  Under  365 of the bankruptcy code, the bankruptcy trustee may accept or reject any executory contract within 60 days after the order for relief.  See 11 U.S.C.  365(d)(1).  If the trustee does not accept an executory contract within that period, the trustee is deemed to have rejected the contract.  See id.  First Keystone argued that because the trustee failed to accept the settlement agreement within 60 days after the order for relief, the Settlement Agreement should be deemed rejected and, thus, unenforceable.  Alternatively, First Keystone argued that Beck breached the Settlement Agreement in June 1997, thus excusing the failure to pay the remaining installments.

Following an evidentiary hearing, the bankruptcy court rejected First Keystone's defenses and entered judgment in favor of the trustee for $240,000 plus pre-judgment interest and attorneys fees.  The District Court affirmed.

### STANDARD OF REVIEW

"While factual findings are reviewed only for clear error, our review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts is plenary."  Travellers Int'l v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 134 F.3d 188, 193 (3d Cir. 1998) (citations omitted); see also Enterprise Energy Corp. v. United States (In re Columbia Gas Sys. Inc.), 50 F.3d

233, 237 (3d Cir. 1995). Because "we are in as good a position to review the bankruptcy court's decision as the district court," we may review the opinion of the bankruptcy court directly. See Sharon Steel Corp. v. National Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989).

DISCUSSION

I. Executory Contract

This Court has defined an executory contract as "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Sharon Steel Corp., 872 F.2d at 39. "Thus, unless both parties have unperformed obligations that would constitute a material breach if not performed, the contract is not executory under  365." In re Columbia Gas Sys. Inc., 50 F.3d at 239. A breach is material when it justifies a suspension of performance. See Farnsworth on Contracts  8.16, at 495 (2d ed. 1998). "The time for testing whether there are material unperformed obligations on both sides is when the bankruptcy petition is filed." In re Columbia Gas Sys. Inc., 50 F.3d at 240.

Souder clearly had unperformed obligations at the time that Beck filed his bankruptcy petition. Souder had yet to make three $85,000 payments to Beck (minus the $15,000 advance). What is at issue is whether Beck had outstanding obligations to Souder or First Keystone.

The parties agree that any continuing obligation of Beck's would arise under paragraph VII of the Settlement Agreement. That paragraph states in full:

VII. Covenants

1. Beck hereby covenants and agrees that prior to May 31, 1993, neither he nor any business, company or entity with which he is affiliated shall employ or engage in any business relationship with any person, business, company or entity who is an employee, agent or affiliate of [First Keystone] as of the Effective Date of this Agreement set forth at Paragraph II, except as follows:

(A) Beck may approach Jackie Coe and Brian McGovern to discuss possible employment. However, no such approach may occur until at least five (5) days after the date of Closing and only after (10) days prior written notice to [First Keystone].

(B)   Beck may also approach John Schwarzenbach and Jean Bodalski to discuss possible employment.  However, no such approach may occur until at least thirty (30) days after the date of Closing and only after ten (10) days prior written notice to [First Keystone].  Notwithstanding any such contact, Mr. Schwarzenbach and Ms. Badalski may not be employed by Beck or any business, company or entity with which he is affiliated prior to January 1, 1993.

(C)   Beck may also approach either Kate McCartney or Katie Craft, but not both, to discuss possible employment.  However, no such approach may occur until at least thirty (30) days after the date of Closing and only after ten (10) days prior written notice to [First Keystone]. Notwithstanding any such contact, neither Kate McCartney or Katie Craft shall be employed by Beck or any business, company or entity with which he is affiliated prior to January 1, 1993.

(D)   Beck may approach the Clark Summit, PA, Allentown, PA and Delaware [First Keystone] branch offices to discuss possible employment or affiliation.  However, no such approach may occur until at least thirty (30) days after the date of Closing and only after ten (10) days prior written notice to [First Keystone].  Notwithstanding any such contact or new agency agreement, the aforesaid branches may not affiliate with Beck or any business, company or entity with which he is affiliated prior to January 1, 1993.

(E)   If any of the aforesaid persons or branches shall leave their affiliation with [First Keystone], Beck shall secure written assurances from each that they have not retained originals or copies of any [First Keystone] books, records, ledgers, forms, lists, financial statements, tax returns, schedules and/or any other materials or documents of any nature which were obtained or generated by or on behalf of [First Keystone] and such written assurances shall be delivered to [First Keystone] within ten (10) days after the [First Keystone] affiliation ends.

(F) It is acknowledged and agreed by the Parties that any violation or breach of the terms set forth in this Paragraph VII. shall subject the breaching Party to a judgment for the payment of damages together with an award of attorneys' fees and costs of suit in amounts to be determined by the Honorable Leonard Sugerman, Judge of the Court of Common Pleas of Chester County or another Judge of that Court if Judge Sugerman is not available.  It is further acknowledged and agreed by the Parties that the restrictions imposed by the terms set forth in this Paragraph VII. are of particular importance for the protection of the existing and future interests of [First Keystone] and that in the even of a breach, a claim for damages will not constitute a full, adequate remedy for [First Keystone].  It is, therefore,

covenanted and agreed that, in addition to any other remedies and damages available, [First Keystone] shall be entitled to injunctive relief including, but not limited to, (a) an Order prohibiting Beck and any business, company or entity with which he is affiliated, for a period of one (1) year from the date of said Order, from employing or engaging in any business relationship with any person, business, company or entity who is an employee, agent or affiliate of [First Keystone]; (b) an Order prohibiting Beck and any business, company or entity with which he is affiliated, for a period of one (1) year from the date of said Order, from directly or indirectly engaging in the mortgage banking business within twenty five (25) miles of the principal office of [First Keystone] (83 Chestnut Road, Paoli, Pennsylvania 19301), which shall mean to include that neither Beck nor any business, company or entity with which he is affiliated shall establish an office or solicit loans within the said twenty five (25) mile radius; and (c) forfeiture by Beck of entitlement to any remaining payments due under and pursuant to the terms set forth in Paragraph VI. B. of this Agreement.

Appendix 59–62.
First Keystone contends that under subparagraph VII.1.(E) Beck had a duty to provide an "Employee Solicitation Notice" and a "Business Record Statement" for each former First Keystone employee associating with Beck during the payment period whether hired before or after May 31, 1993.  We find this position inconsistent with the unambiguous terms of the Settlement Agreement.

The Settlement Agreement  contains no provision that can be read to extend Beck's employee solicitation notice and business records obligations throughout the payment period.  The only time period mentioned at all in Paragraph VII is the May 31, 1993 date in Paragraph VII.1.  The first sentence of paragraph VII.1. states that Beck "covenants and agrees that prior to May 31, 1993, neither he nor" any business with which he is affiliated will tamper with any employee of First Keystone.  That sentence sets out a general rule that Beck may not recruit First Keystone employees before May 31, 1993.  Subparagraphs (A) though (E) set out exceptions to that general rule and the conditions placed upon those exceptions.  The first four subparagraphs set out certain employees whom Beck may approach to discuss employment before May 31, 1993.  Subparagraph (E) refers back to the previous four paragraphs.  It states, "If any of the

aforesaid persons or branches shall leave their affiliation with [First Keystone], Beck
shall secure written assurances from each . . . ."  Those requirements relate to the
individuals listed in subparagraphs VI.1(A)-(D), and Beck's obligation under
subparagraph (E), like his obligation under all of paragraph VII. ended on May 31, 1993
(or at the latest June 10, 1993--ten days after May 31, 1993).

       The Bankruptcy Court and the District Court correctly found that there were
no unperformed obligations of Beck at the time he filed for bankruptcy and, accordingly,
that the Settlement Agreement was not an executory contract at that time.

II.  Breach of Contract

       Because Beck had no continuing obligations under the Settlement Agreement after June 10, 1993, he could not have breached the agreement in June 1997.

CONCLUSION

       The judgment of the District Court will be affirmed.

_____

TO THE CLERK:

     Please file the foregoing Memorandum Opinion.


                 /s/ Walter K. Stapleton
                      Circuit Judge